## IRVIN *against* THE TURNPIKE COMPANY.

The benefit which results to individual property by the incorporation of a compa-
ny and location of a public road, does not, in contemplation of law, enter into the
consideration of the contract of subscription; and such subscriptions are necessa-
rily subject to the power of the legislature to change the location of the road,
where the contrary is not expressly stipulated.

WRIT of error to the Special Court of Common Pleas of *Centre*
county. *(Reed* president.)

This was an action brought by the *Susquehanna and Phillips-
burg Turnpike Road Company* against *William Irvin*, to re-
cover from him certain dividends of his subscription to the capital
stock of said company.

The *Susquehanna and Waterford Turnpike Company*, was
incorporated by the act of the 22d February, 1815, with authority
to locate and make a road from the town of *Waterford*, in the coun-
ty of *Erie*, to the river *Susquehanna*, at or near the mouth of
*Anderson's* creek, in the county of *Clearfield.*    The 28th section
of this act provides, "That a bridge shall be erected over the river
*Susquehanna*, where the said road terminates, at the joint expense

(Irvin *v.* The Turnpike Company.)

of the said company, and the company herein after mentioned." Then follow several sections incorporating a company to make a road from *Northumberland* to the *Susquehanna*, "at or near the mouth of *Anderson's* creek, in the county of *Clearfield.*" By a subsequent act of assembly this latter company was divided into different companies, who were authorized to make the different sections of the road, between the extreme points: and the present plaintiffs *the Susquehanna and Phillipsburg Turnpike Road Company*, was one of them, who was authorized to receive subscriptions for, and make that part of the road, which terminates "at or near the mouth of *Anderson's* creek;" and where the bridge was to be built. To the stock of this company, *William Irvin*, the defendant, subscribed. On the 4th September, 1819, the charter was obtained, and the company went into operation. *William Irvin* was elected a manager, and was appointed to locate the road according to the act of 1812. The road being not yet made, in 1820, an act of assembly was passed, changing the location of the bridge, which the original act provided should be across the *Susquehanna* at the termination of the first mentioned road, "at or near the mouth of *Anderson's* creek:" and directing the same to be located "at the mouth of *Sugar-camp* run," (being about two miles further down the river,) and also directing the route of the road to be so changed as to accommodate itself to the bridge. The state subscribed a large portion of the stock.

The defendant to support his defence, offered in evidence the petition to the legislature, on which the act of March, 1820 was obtained—accompanied by the remonstrance of *William Irvin*, and other citizens of *Clearfield* county against the proposed alteration, which was also presented to the legislature, with evidence, that the change made by the said act of 1820, materially affected and injured the property of *William Irvin*, and that a road could have been made and a bridge erected, equally condusive to public interest, and at one-quarter the expense on the original route, than that on the one to which it was altered; with the draft which accompanied the petition, to shew the manner in which the law was obtained.

That *William Irvin's* son who subscribed for his father, at the time of subscribing, was induced so to do by the representation of the commissioners, that the bridge would be built at the place first contemplated, and that he would not otherwise have subscribed; the commissioners taking in the subscription, shewed him the law, and stated at the same time, it was so fixed in the act; That the contract at the time of subscribing was changed by the subsequent act of assembly. And also to prove, that at and before his subscription to the stock of the plaintiff, he was the owner of a tract of land on the *Susquehanna* river, opposite the point where the *Susquehan-*

(Irvin *v.* The Turnpike Company.)

*na* and *Waterford* turnpike terminates; and that by the law and the supplements thereto, incorporating the said company, and the points fixed in the said law, the said turnpike road must have passed through his land; and the bridge to be erected across the *Susquehanna*, would have butted on, and adjoined the land of said defendant, that by the alteration made by the act of 1820, the bridge was built two miles below his land, and the road located on the opposite side of the river from his land, by which he was injured to the amount of one thousand dollars, at least, and this, to shew that the consideration that induced him to subscribe, had entirely failed.

The evidence having been objected to by the plaintiffs, it was over-ruled by the court, who signed a bill of exceptions at the instance of the defendants.

The defendant requested the court to charge the jury upon the following points:

1. That the act of 11th March, 1820, changed the nature of the contract entered into by defendant on his subscription, and unless he acquiesced in the same, subsequent to the passage of the law, that the plaintiffs are not entitled to recover.

2. That an act of assembly cannot make a new contract, without the consent of the party, and make it relate to an antecedent contract; and if the jury believe that the act of 1820, does so change the contract entered into by the defendants, with the plaintiff, at the request of the plaintiff, against the will of the defendant—then he is discharged from his liability.

3. That the president and a quorum of managers could not give consent to an alteration of the chartered rights of the corporators, so as to bind those dissenting from the change, under the laws incorporating the plaintiffs. That this, if it could be done at all, could only be done by a majority of the stock-holders, at a general meeting.

4. If the jury believe that the defendant has been injured by the alteration of the route, and the erection of the bridge, by the act of 11th March, 1820, and that he never acquiesced in the same, then he cannot be compelled to pay his subscription.

5. If the jury believe that the defendant subscribed to the stock of the plaintiffs on the faith of the existing laws at the time of his subscription, that the road must pass through his land, and the bridge be erected across the river adjoining and opposite his lands, and this was the inducement to his subscription which has been destroyed by the act of 1820, then the plaintiffs cannot recover.

These points, as applied to the facts of this case, were answered in the negative; and the jury found a verdict for the plaintiffs.

*Potter* for plaintiff in error.

There is no good reason why the ordinary rules of law, which

are generally applicable to contracts, should not be applied to the circumstances of this case.    A contract to pay, is only binding, when there is some consideration for entering into it; and it is equally true, that when that consideration fails, the obligation to pay ceases.   Here this road was to pass through a new country, and it was not at all contemplated that the profits of the road would compensate the individuals for their money subscribed; it was the facilities and benefits which would result to their property: and it was upon this consideration that *Irvin* entered into the engagement to pay.   Was it not, therefore, competent for him to shew by proof, that that consideration had entirely failed?   We believe it was, and that the law is so held in *McConahy* v. *The Turnpike*, 1 *Penn. Rep.* 426.

The managers had no authority to apply to the legislature to change the route of the road; their powers and duties are prescribed by the act of incorporation. *Livingston* v. *Lerich*, 4 *John Chan.* 597.    *Rex.* v. *Spencer*, 3 *Burrows*, 1837.    *Rex.* v. *Cutbush*, 4 *Burrows*, 2207.    Wherever there is a change in the route of a road, without the consent of the corporators, there can be no recovery against them. 8 *Mass.* 268.  11 *Mass.* 384.  *Marelborough* v. *Smith*, 2 *Con. Rep.* 579.    4 *Amer. Dig.* 142, No 31, 36.    *Union Locks* v. *Torone*, *Adam's Rep.* 44.   *Case of St. Mary's Church*, 7 *Serg.& Rawle*, 560.

The acts of a few of the corporators, not within the scope of the powers delegated to them, will not bind the rest, or affect their rights.    *Bridgman's Eq. Dig.* 391, *tit. Corporation*, No. 25. *Ellis* v. *Marshall*, 2 *Mass.*269.   *Bac. Ab. tit. Corporation*, No. 3, *let. B.*    Nor can the rights vested in a corporation be affected by subsequent enactment; *even at the instance of a majority of the corporation.*    *Wales* v. *Stetson*, 2 *Mass.* 146.   *Gray* v. *The Portland Bank*, 3 *Mass.* 364.   *Commonwealth* v.*Jarrett*, 7 *Serg. & Rawle*, 460.    4 *Wheat.* 518.

*Blanchard* for defendant in error.

This company was incorporated for the purpose of making a great public improvement; and in no part of the act of incorporation, is there to be found a recognition of the rights or interests of individuals, with regard to the object to be attained.    To make a road between two extreme points, is the important design, and all intermediate points, or whether a bridge is to be built higher up or lower down a river, which the road crosses, are matters of secondary consideration.    Doubtless individuals are interested in the locations, but whenever those interests conflict with the public advantage, they must be subservient thereto; otherwise the main de-

(Irvin *v.* The Turnpike Company.)

sign of the act of incorporation would be defeated.   The board of managers regularly chosen to carry into effect the law, found that it might be amended; and upon representing the facts to the legis-lature, the act was passed changing the location.

The state at this time owned two thirds of the stock, and had a right to pass the law, as it was applied for by the company.   As to the vested rights of Mr. *Irvin*, he had none, with regard to the location of this road, and if he had, they must yield to public con-venience.   *Estep* v. *Hutchman,* 14 *Serg. & Rawle,* 439.   *Eakin* v. *Raub,* 12 *Serg. & Rawle,* 372.   *Foster* v. *Bank,* 16 *Mass.* 270. The cases cited by the counsel of the plaintiff in error, are not at all applicable to this case, inasmuch as the companies incorporated as referred to in those cases, were not to make a road for public purposes, but from one township to another, for the benefit of the inhabitants residing near to it.   They were incorporations for pri-vate purposes, and to affect their corporate rights, affected on-ly the individuals.   The public had no interest in it.

The opinion of the court was delivered by

GIBSON, C. J.—Our turnpike roads have been made by incorpo-rated companies, in which the state has usually been the principal stockholder.   But though the funds have been furnished by indi-vidual subscription, the consideration for the corporate franchise, as well as the object to be promoted, has exclusively been the public benefit.   With this the individual interest of the stockholder has been combined, by giving him a share of the tolls, in full compen-sation of his share of the capital.   That an expectation of benefit from a rise in the value of property near the route, has been a pow-erful spring, in putting these incorporated bodies in motion, is not to be denied.   Yet, though reliance has been placed on the effect of it, the legislature has never encouraged it so far as to recognize it as a condition of the contract of subscription.   Our acts of in-corporation have been moulded to more general interests.   Their provisions have been adapted to the protection or encouragement of no local interest whatever, further than to compensate direct injury to private property in the execution of the work; and this, too, without deduction of the indirect benefit supposed to be received by the owner.   In fact, I have found nothing to indicate that it had ever entered into the consideration of the legislature at all.   We doubtless owe many of our roads to it—at least, it has furnished a very powerful incitement—but it is doubtful whether its advanta-ges have not been attended with more than an equal amount of mis-chief in the predominance of private interest over public conve-nience.   But certain it is, that in no instance has the legislature au-

(Irvin *v.* The Turnpike Company.)

thorized a conditional subscription, dependent on a particular location of the road; or given color to a notion that it might be regarded as an implied consideration of the contract.   On what principle, then, are *we* to recognize it as such?   By the constitution, the right of the stockholders to every thing granted in the charter, is made inviolable; consequently their rights as corporators are not to be impaired.   But the public welfare being paramount to every thing beside those rights, and power to correct errors of location being essential to the promotion of it, subscriptions are necessarily subject to it where the contrary is not expressly stipulated.   The objection to this, seems to be rested on the occasional hardship of its operation; as an instance of which, a liberal subscription, by the inhabitants of a town, named as a point, has been put in a strong light. But the abstract propriety of a principle cannot be determined, by an application of it to masses instead of individuals, or by the aggregate hardship of its operation in a given case.   Such masses, like individuals, take their measures at their own risk, and subject to the paramount rights of still greater masses.   The fallacy of the whole seems to be, in confounding the motive for entering into the contract, with the consideration of it; for nothing is part of the consideration that is not regarded as such by both parties, and nothing but the benefit to be received as a corporator is held out to the subscriber by the corporation or the state.   Of benefit to be received as a landed proprietor, he has no assurance but his calculation of the chances, and this, it seems to me, the defendant was bound to know; yet he relies on representations by the commissioners, that the site of the bridge was fixed by law, where it would be peculiarly advantageous to him.   What is that but to offer the motive which impelled him to subscribe, as a circumstance to influence the construction of the contract?   It is not pretended that the commissioners misrepresented any fact which it was material for him to comprehend, or did not leave him to judge of the permanency of the legislative provisions then in force; and for all beside, he was bound to know, that acting under a limited authority, they had no power to make conditions, or bind the corporation in a matter not committed to them. As there is, then, no peculiar circumstance to distinguish this case, it must be decided on the abstract nature of the contract.   It will hardly be pretended that the managers of a road may not correct errors of location between intermediate points, consistently with the rights of previous subscribers; and I am unable to perceive a reason why the legislature should not be taken to have reserved a like power over the intermediate points themselves.   An error would be as hurtful in the one as in the other; and if an injudicious point may not be abandoned out of respect for private interests, it must be because such interests are superior to those of the commu-

(Irvin *v.* The Turnpike Company.)

nity, and because the charter has been granted for individual emol-ument, and not the public good. That is not pretended. On the contrary, a power to correct errors is conceded to be inherent and indispensable. But how may it be exercised consistently with the constitution, if it be according to the argument, inconsistent with an implied condition of the contract of subscription? The defendant goes for a recision of the contract. But the change of an intermediate point, is not a recision of the contract, or it surpasses the legislative power. It then comes to this, that a power conceded on all hands to be an essential one, cannot be exercised without discharging all previous responsibilities, and resolving the corporation into its original elements. It will be said that no one would be released who had not suffered a substantial injury. But the legal effect of an alteration, cannot depend on its actual effect, or the extent of the injury occasioned by it. It is a rudimental principle of the common law, that the violation of a right, without actual injury, entitles the party to nominal damages. So an estate may be acquired or lost by the performance or omission of a condition which, in the abstract, is perfectly indifferent; and if permanence of location, were at all a condition here, it would be so in favor of all who had subscribed, whether with a view to indirect advantage, or the benefit to be had from the tolls. Let it not be thought that the subscriber assents to the act which creates the change, by embracing the alternative which it is thought to put within his reach. His assent would ratify the act, if at all, in all its parts; and in that aspect there would be no recision in the case. Beside, to assent implies a power to dissent; and what is the alternative that would be presented? Merely to renounce the benefits of the corporation, or submit to the new conditions; and in that predicament, the contract would be as much impaired with his assent as without it. Suppose he should still insist on the original contract: the consequence would be a direct collision between an act of the legislature and the constitution. It may be thought unnecessary to view the question in that aspect, as it may be supposed the defendant has not thought proper to insist on it. But does he not insist on it, when he refuses to perform his part of it, because one of its conditions has been, as he says, violated by the plaintiff? He refuses his assent to the act of the legislature, when he refuses to abide by the conditions it imposes; and those conditions must be executed, or an act of the legislature admitted to be indispensable to the public welfare, must be rendered abortive. Apply the principle of this supposed assent, to the case of a stockholder, whose subscription has been in part paid in. According to the argument, he would be released from further liability. But what would compensate the loss of payments already made? If the act would really infringe on a condi-

(Irvin *v.* The Turnpike Company.)

tion of the contract, the privilege of retiring with the loss of a part of his capital, would be no reparation.   Give him an action to recover his money back, and the difficulty still remains; for the violation of the constitution is found in the very act which would make a resort to an action necessary.   But the extreme consequences of the principle would be positively destructive, as it would, for the same reason, give an action to those who had paid the last farthing, and enable them to withdraw their share of the capital, at the expense of ruin to the enterprise.   And thus a power admitted on all hands to be indispensable to the successful prosecution of the work, could be exercised after experience had demonstrated a fatal error in the plan, only by undoing all that had been done; which is in effect to say, it cannot be exercised at all.   Were we to indulge these imperfect equities, we would, to preserve consistency, be compelled to go that far, as a middle course would lead to a labyrinth of inextricable subtilties.   Either, then, the consequential benefits to the stockholders, not as corporators, but proprietors, are so far superior to the public good, that the legislature may do no act to affect them, or an unlimited right to interfere is a tacit condition of subscription.   The defendant was allured by a prospect of gain in a matter collateral to the object of the enterprise, and he embarked his capital, as he would have done in any other speculation, at the risk of disappointment.   He got no pledge that, in the event of competition, the public interest would not be preferred to his—he exacted none—it would have been a breach of trust to have given him any.   Whatever might be the effect of such a pledge, it certainly cannot be implied from the bare act of subscription; and with this, the decisions cited from the *Massachusetts Reports* entirely agree.   There the capital was to be raised, not as with us, by instalments, enforced by an action on the contract of subscription, but by assessments on the share enforced by forfeiture and a re-sale of the stock, which, as the act of subscription was a bare agreement to become a share-holder, without incurring personal responsibility, was deemed to be the only remedy provided by the act of incorporation.   An action, therefore, could be maintained only on an express promise to pay; and as there was no moral obligation in the case, a sufficient consideration was sought for, and thought to be found, in the peculiar advantages of the location.   As the legislature had prescribed neither contract nor conditions, the parties were at liberty to establish any terms of responsibility which they might think proper to adopt; and it is not surprising that the courts refused to enforce the promise wherever there was a failure of what was regarded as the consideration of it by the parties themselves.   It is obvious that the present is not that case, the liability of the defendant having arisen from a promise in consideration of benefits to be

drawn from the profits of the corporation, and not from a location of the road peculiarly beneficial to him as a landholder. I take it, then, that the change of an intermediate point does not rescind the subscription.

But it is said that the change here was not of an intermediate, but a terminative point; to which, on the authority of the *Indiana and Ebensburg Turnpike* v. *Phillips*, 2 *Penn. Rep.*, 183, is attributed greater effect, by reason of its operating a fundamental change in the objects and identity of the company. In that case, an incorporated company, to which subscriptions had been made, was divided into two distinct corporate bodies; and to the one or the other of these, the original subscribers, were arranged according to their residence east or west of the specified point; to do which, without their consent, the legislature was deemed incompetent. What is the case at bar? The legislature had incorporated two companies to make a road from *Waterford* to *Northumberland*, and had fixed the West Branch of the *Susquehanna* "at or near the mouth of Anderson's creek," as the line of division between the two sections. Over this a bridge was to be built at the joint expense of the two companies; and it is certainly fair to admit that the eastern bank was intended to be a terminative point of the eastern section. That section was afterwards subdivided and assigned to five new companies formed out of the old one, of which the plaintiff is the one that adjoins the point intended to be the site of the bridge. At this juncture the defendant subscribed the shares that have occasioned the controversy; subsequent to which the legislature authorized the companies to change the site of the bridge to the mouth of *Sugar-camp* Run, a mile or two below, and defray the expense of its erection with the public subscription to the route; in consequence of which the termination of the plaintiff's section was shifted from the east to the west bank. But the change was essentially in the site of the bridge, the termination of the section continuing to be, in the words of the original act, "the river *Susquehanna* at or *near* the mouth of *Anderson's* Creek." It was in fact within two hundred feet of the point specified, which, in a tract of more than as many miles, can hardly be esteemed a material deviation. Perhaps the maxim *de minimis* might be applied to it. But was the change, small as it is, in any thing but an intermediate point? This corporation was not to conduct its operations as an isolated body and with detached views, but as an individual associated with similar bodies in the systematic accomplishment of a great public work, which was viewed as a whole. The extremities of the sections were, in truth, intermediate points as respects the entire route, a change of which could not vary the productiveness of the stock. Of what, then, has the defendant to complain? Not of a

decrease of corporate interest, nor of a change of corporate object or identity; of nothing, in short, but a loss of advantages expected to be realized from the location of the bridge, of which I have attempted to show, he might be legally deprived by the change of an intermediate point; and it therefore seems to me he cannot set it up as a defence to the action.

*Rogers* and *Kennedy,* Justices, dissented.

Judgment affirmed.